## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| HECKERT CONSTRUCTION COMPANY, )<br>INC., )<br> )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br> )<br>SINCLAIR OIL CORPORATION, )<br> )<br>Defendant. )<br>_____ ) | Case No. 10-1151-CM |

## MEMORANDUM AND ORDER

Plaintiff Heckert Construction Company, Inc. brings this diversity breach of contract action against defendant Sinclair Oil Corporation.  During 2007 and 2008, the parties entered into a number of contracts for defendant to sell plaintiff specified quantities of asphalt at set prices.  In July 2008, defendant notified plaintiff that it would not fulfill its prior contracts, and that unless plaintiff agreed to substitute a new contract (at a higher price), defendant would not provide any asphalt to plaintiff.  Plaintiff eventually agreed to a new contract with defendant in August 2008—the "New Asphalt Contract."  The New Asphalt Contract contains a release of obligations, liabilities, and claims arising from the prior contracts.  Plaintiff now claims that defendant committed an anticipatory and actual breach of the earlier contracts with plaintiff, and that plaintiff only entered into the New Asphalt Contract under economic duress.  Plaintiff therefore argues that it is entitled to damages under the original contracts and that the New Asphalt Contract is voidable.  The case is before the court on Plaintiff's Motion for Partial Summary Judgment (Doc. 65) and Defendant Sinclair Oil Corporation's Motion for Summary Judgment (Doc. 69).

I.    **Factual Background**

Between April 2007 and June 2008, plaintiff and defendant entered into a number of asphalt

sales contracts ("Original Asphalt Contracts").  In these contracts, plaintiff agreed to purchase asphalt

of a particular grade from defendant at various prices ranging from $280/ton to $425/ton.  Each

contract includes an "Allocation Clause" and a "Force Majeure Clause."  The Allocation Clause

provides that defendant may allocate its asphalt products between all purchasers under certain

conditions, and the Force Majeure Clause discusses circumstances under which defendant may be

relieved from liability for failure to deliver all contracted-for products.[1]

In May and July of 2008, defendant sent plaintiff a series of letters concerning the Original

Asphalt Contracts and asphalt supply:

- **May 21, 2008:**  Defendant, through its marketing executive Craig Menees, sent a letter to

  plaintiff and its other customers advising that the Sinclair Tulsa refinery was "currently

  depleted of asphalt."  Defendant also notified them, however, that it anticipated that asphalt

  would start running again in early June 2008.

- **July 11, 2008:**  Defendant offered plaintiff a contract at $530/ton for asphalt (although the

  parties were already under contract).  This letter notified customers that within three days, there

  would be no more asphalt available for defendant's asphalt customers.

- **July 15, 2008**:  Again, defendant offered a contract at $530/ton for asphalt.  The July 15 letter

  states, "We understand that this disruption in your expected asphalt supply will have significant

---

[1] Plaintiff proposes a number of facts focusing on the wrongful nature of defendant's conduct and the relationship between
Sinclair Oil Corporation and Sinclair Refining Companies.  The court does not recount those facts here.  For purposes of
this Memorandum and Order, the court assumes that defendant's conduct leading up to the parties reaching agreement on
the New Asphalt Contract was wrongful.  Omission of these facts should not be interpreted as the court's stamp of approval
on how defendant handled matters in 2008.  The court has omitted the facts only because ultimately, they are immaterial to
the court's ruling.

consequences."  In deposition, Mr. Menees, the author of the letter, clarified that he was referring to "the relationship between the customer, our customers, such as [Charles] Heckert, and his clients."  Mr. Menees testified that defendant's position was "we will buy the raw materials, in this case the crude oil, to produce asphalt to meet your requirements if you agree to $530 and sign a new contract."

- **July 25, 2008:**  Defendant acknowledged plaintiff's failure to respond to defendant's July 11 and July 15 letters, and stated that plaintiff should contact defendant by July 29, 2008, if plaintiff opted to accept defendant's new contract offer.

After receiving defendant's $530/ton offer, plaintiff searched for replacement asphalt, but was unable to find a vendor who would be less expensive than defendant's price.  The $530/ton price offered by defendant was less than the market price of PG 64-22 asphalt at the time—between $586 and $666/ton.  Plaintiff purchased some replacement asphalt from another vendor at $650/ton.

Ultimately, plaintiff considered its alternatives, consulted a lawyer, and agreed to the new contract.  In deposition, Mr. Heckert testified that it was "cost prohibitive" not to sign the contract, and agreed that it was a business necessity to sign it.  Plaintiff's attorney, Robert F. Morgan, advised plaintiff that defendant was "putting a gun to [plaintiff's] head and telling [plaintiff] to agree that the increase in the price of sour crude constituted 'force majeure' otherwise it will not supply the asphalt which you require to perform to the terms of your contract with your customers."  Mr. Morgan advised plaintiff to "acknowledge that you do not agree with [defendant's] claims but at this point, [defendant] is the only available source of supply and you have no choice except to accept their terms."  Plaintiff eventually wrote a letter to its customers per Mr. Morgan's advice, advising them of the situation and that plaintiff was advised by its attorneys that litigation of the issue would take two or more years.

Under the New Asphalt Contract, plaintiff agreed to purchase, and defendant agreed to provide, 11,000 (± 10%) tons of liquid asphalt at a price of $530/ton.  In other words, plaintiff promised to purchase 90% of the 11,000 tons, or 9,900 tons.  Plaintiff was able to pay the higher price with cash on hand and did not need, seek, or receive a loan to cover the increased price.  Neither was plaintiff forced to lay off any employees due to the increased cost.

Under the New Asphalt Contract, plaintiff agreed to release any claims against defendant under the Original Asphalt Contracts:

> [T]his Contract supersedes and takes the place of any prior existing contract(s) between Buyer and Seller for the supply of asphalt products.  Buyer and Seller hereby agree to release each other from any further performance obligations, liabilities or claims with respect to any such prior existing contract(s), provided, however, that Buyer shall remain liable to Seller for any payments due in connection with asphalt products which have already been delivered.

Before signing the contract on behalf of plaintiff, Mr. Heckert read and understood the release clause.

The New Asphalt Contract also contains an integration clause providing:

> This Contract contains the entire agreement between the parties hereto and there are no oral representations, stipulations, warranties, agreements, or understandings with respect to the subject matter of this contract which are not fully expressed herein.  Neither this Contract nor its execution has been induced by any representation, stipulation, warranty, agreement or understanding of any kind other than those herein expressed.  The terms and conditions stated herein shall prevail over any contradictory or conflicting terms and conditions contained in Buyer's confirmation or acceptance and shall prevail over any contradictory or conflicting course of dealing or usage of trade.

Plaintiff did not purchase all of the asphalt it contracted for under the New Asphalt Contract.  Plaintiff "underlifted" by 5,735 tons.  Underlifting is the practice of not pulling the entire amount of asphalt stated in a sales contract.  Defendant was able to resell all of the underlifted tonnage to other customers, but claims that it was damaged in the amount of $1,240,037.84 because plaintiff failed to meet its obligation.  In making this calculation, defendant chose four customers who purchased asphalt

during the timeframe that plaintiff failed to purchase asphalt.  Defendant used these customers as its "mitigation of damage customers."

Lynn Hart, defendant's Vice-President/General Counsel, testified that he knows of no other lawsuits in the last five years against defendant's customers for the practice of underlifting.  In the nine or ten years that plaintiff was defendant's customer, defendant has never made another claim against plaintiff for underlifting, although plaintiff has underlifted throughout that entire period of time.

Gina Swensen is an administrative assistant for defendant who supports Mr. Menees.  Ms. Swensen testified that sometimes customers would purchase more, or less, than what was reflected on sales orders.  When asked why defendant chose the four customers that it used as "mitigation of damage customers," Swensen responded, "They are valid sales, and I could."  Ms. Swensen did not identify any objective criteria for choosing the particular customers as mitigation customers.  Mr. Hart testified that defendant chose the four mitigation customers because "they were customers that took product after [plaintiff] had discontinued taking product, and they fell within the timeframe, so we selected them."  However, a broad list of customers meeting the "timeframe" criteria exists.

John Chris Clark is a former asphalt salesperson for defendant who specifically serviced plaintiff.  When a customer asked to modify a contract to provide for more or less tonnage, Mr. Clark sought approval from his supervisor, Mr. Menees.  Sometimes customers got more asphalt that the contract stated, and sometimes less.  Peter Johnson, defendant's president, testified "It is difficult for an asphalt contractor to lift precisely the number of barrels on a contract.  I think almost all contracts end up with some degree of underlift or some degree of overlift."

In deciding how much asphalt to contract for in the New Asphalt Contract, Peter Kemmeter provided Mr. Heckert with a list of pending projects to determine the amount of

pending work, its value, and the price of asphalt.  Mr. Kemmeter is an estimator for plaintiff.

Plaintiff determined how much asphalt it needed by looking at its books.  Mr. Clark, however,

suggested overestimating the amount of asphalt needed to ensure that plaintiff received an

adequate supply.  Mr. Kemmeter took Mr. Clark's statement into account and overestimated the

amount of asphalt plaintiff would need.

## II.    Standards for Judgment and Choice of Law

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine

issue as to any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c).  In applying this standard, the court views the evidence and all reasonable inferences therefrom

in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670

(10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In determining the validity of plaintiff's claims, the court must determine what state's law

applies.  Defendant contends that Oklahoma law applies because the contracts were to be performed in

Oklahoma (where defendant agreed to deliver the asphalt under the contracts).  Plaintiff contends that

Kansas law applies.  The court is uncertain why the parties continue to litigate this dispute, as it

appears that the law of both states is substantially similar.  Nevertheless, the court will evaluate which

state's law applies.

When a federal court is exercising diversity jurisdiction, it must apply the substantive law of

the forum state, including its choice of law rules, and federal procedural law.  *Boyd Rosene & Assocs.,*

*Inc. v. Kan. Mun. Gas Agency*, 173 F.3d 1115, 1118 (10th Cir. 1999); *Garcia v. Int'l Elevator Co.*, 358

F.3d 777, 779 (10th Cir. 2004); *Ahrens v. Ford Motor Co.*, 340 F.3d 1142, 1145 (10th Cir. 2003);

*Blackhawk-Cent. City Sanitation Dist. v. Am. Guarantee & Liab. Ins. Co.*, 214 F.3d 1183, 1188 (10th

Cir. 2000).  In Kansas, the choice of law depends on whether the dispute involves questions of contract obligation or performance.  *Moses v. Halstead*, 581 F.3d 1248, 1252 (10th Cir. 2009).

For questions involving the substantive obligations of the contract, Kansas courts apply the Restatement (First) of Conflict of Laws § 332 (1934), and the doctrine of *lex loci contractus*, i.e., the law of the state where the contract is made governs.  *See Moses*, 581 F.3d at 1252; *In re K.M.H.*, 169 P.3d 1025, 1031–32  (Kan. 2007); *Wilkinson v. Shoney's, Inc.*, 4 P.3d 1149, 1160 (Kan. 2000); *Found. Prop. Invs. v. CTP*, 159 P.3d 1042, 1046 (Kan. Ct. App. 2007); *Layne Christensen Co. v. Zurich Canada*, 38 P.3d 757, 766 (Kan. Ct. App. 2002).   A contract is made where the last act necessary for its formation occurs.  *Wilkinson,* 4 P.3d at 1160; *Found. Prop. Invs.*, 37 159 P.3d at 1046; *Layne Christensen Co.*, 38 P.3d at 767.

For questions involving performance of the contract, the place of performance determines the manner and method as well as the legality of the acts required for performance.  *See Moses*, 581 F.3d at 1252; *Aiken v. Employer Health Servs., Inc.*, No. 95-3196, 1996 WL 134933, at *3 (10th Cir. Mar. 26, 1996) (referencing but not applying the place of performance rule); *Layne Christensen*, 38 P.3d  at 767 (referencing but not applying the place of performance rule); *Aselco, Inc. v. Hartford Ins. Group*, 21 P.3d 1011, 1018 (Kan. Ct. App. 2001) (applying the place of performance theory).

The determination of whether the dispute involves questions of obligation or performance, however, is not always clear-cut.  *See Moses*, 581 F.3d at 1252.  And this case presents no exception. While certainly plaintiff's complaint is that defendant did not perform its obligation of providing asphalt at the original price, the crux of the matter the court must resolve is whether defendant effectively negated its obligation by entering into a subsequent contract with plaintiff.

The court determines that the real issues in this case are ones of contractual obligation, and not performance.  This means that the court applies the law of the state of contract formation.

Mr. Heckert testified that plaintiff accepted the contracts in Crawford County, Kansas, and defendant has not disputed this fact.  Instead, defendant focuses on the location of performance. Generally, the party seeking to apply the law of a jurisdiction other than the forum has the burden to present sufficient facts to show that other law should apply.  *Layne Christensen*, 38 P.3d at 767.  The court will therefore apply Kansas law.

## III.  <u>Discussion</u>

The court first addresses defendant's motion for summary judgment.  As will become evident, the court does not address a number of the parties' arguments because the court's rulings on some of the arguments render others moot.

### A.  Defendant's Motion for Summary Judgment

Defendant asks the court to grant summary judgment in its favor on several bases: (1) The New Asphalt Contract precludes plaintiff's breach of contract claims under the Original Asphalt Contracts because it contains a valid release of claims and constitutes a novation; (2) Plaintiff is estopped from asserting a breach of contract claim under the Original Asphalt Contracts or has waived such a claim; (3) Plaintiff did not enter into the New Asphalt Contract under economic duress; (4) The New Asphalt Contract was supported by valid consideration; (5) Plaintiff breached the New Asphalt Contract by failing to purchase all of the asphalt required, entitling defendant to summary judgment on its counterclaim; and (6) Plaintiff cannot recover consequential or incidental damages.

#### 1.  *Plaintiff's Breach of Contract Claims*

The court begins with the validity of plaintiff's breach of contract claims.

a.  <u>Release</u>

First, defendant argues that plaintiff cannot prevail on its breach of contract claim because plaintiff agreed to release all claims under the Original Asphalt Contracts when it signed the New Asphalt Contract.

Kansas courts favor the use of release and compromise to resolve disputes. *White v. Gen. Motors Corp.*, 908 F.2d 669, 672 (10th Cir. 1990) (citing *Kennedy v. City of Sawyer*, 618 P.2d 788, 803 (Kan. 1980)).  Release, however, is an affirmative defense, and defendant bears the burden of proving it. *Id.* (citing *Tabor v. Lederer*, 472 P.2d 209, 211 (Kan. 1970)).

The New Asphalt Contract contains an unequivocal release of claims, as set out in the Factual Background of this Memorandum and Order.  The language is unambiguous.  The evidence before the court indicates that plaintiff's corporate representative read the release and understood it.  The court determines that the release effectively bars plaintiff's breach of contract claim unless a reason such as duress or lack of consideration nullifies the New Asphalt Contract.[2]

b.  Duress

Plaintiff argues that the New Asphalt Contract (and the release contained therein) is unenforceable because plaintiff entered into the contract under economic duress.  Whether facts are sufficient to constitute duress is a matter of law. *Comeau v. Mt. Carmel Med. Ctr., Inc.*, 869 F. Supp. 858, 865 (D. Kan. 1994) (citing *Hastain v. Greenbaum,* 470 P.2d 741, 746 (Kan. 1970)); *see also White*, 908 F.2d at 673.  Until recently, Kansas courts had not explicitly analyzed duress under the rubric of "economic duress" or "business compulsion." *Comeau*, 869 F. Supp. at 865.  In *Comeau*, Judge Lungstrum held that Kansas law would recognize the concept of economic duress. *Id.*; *Luttojohann v. Goodyear Tire & Rubber Co.*, 927 F. Supp. 403, 411 (D. Kan. 1996).  He analyzed whether the plaintiff could prove economic duress by establishing the following elements: "(1) a

---

[2] Similarly, so long as the release is effective, plaintiff's claim for breach of the duty of good faith and fair dealing also fails.  This claim only arises under the Original Asphalt Contracts, so if the release effectively bars recovery under the Original Asphalt Contracts, plaintiff cannot recover for breach of the duty of good faith and fair dealing.

wrongful act or improper threat; (2) the absence of a reasonable alternative to entering the agreement; and (3) the lack of free will." *Comeau*, 869 F. Supp. at 865 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990)).  Under this test, Judge Lungstrum held that the determination of reasonable alternatives is an objective inquiry.  *Id.*  The court considers the range of possible alternatives—regardless of whether such alternatives were considered by the plaintiff.  *Id.*  The party asserting duress must show why there was an absence of such alternatives in order to avoid a contract because of economic duress.  *Id.* (citing *Libel v. Libel I*, 616 P.2d 306, 308 (Kan. Ct. App. 1980)).

The Kansas Court of Appeals, however, recently addressed a claim of economic duress in *Bank of America, N.A. v. Narula*, 261 P.3d 898 (Kan. Ct. App. 2011).  *Narula* rejected *Comeau*'s adoption of the "absence of reasonable alternative" element.  *Id.* at 913–14.  Instead, *Narula* cited *Hastain v. Greenbaum*, a Kansas Supreme Court case from 1970, and used the following test:

> To constitute duress by threats the actor's manifestation must be made for the purpose of coercing the other; must have for its object the securing of undue advantage with respect to the other; must be of such a character that it is adapted to overpower the will of the other and is reasonably adequate for the purpose; must in fact deprive the other of free exercise of will; and must cause the other to act to his detriment.

261 P.3d at 913 (citations and internal quotation marks omitted).  In light of *Narula*, it appears that Kansas law does not require demonstration of the absence of a reasonable alternative.  In any event, application of this element would not change the court's decision.

Plaintiff claims that the following facts show that it entered into the New Asphalt Contract under economic duress or business compulsion: (1) defendant threatened to cut off its asphalt supply during a time it knew was the heart of paving season; (2) defendant had planned to do so since April 2008; (3) defendant told plaintiff "it would mean significant consequences" with plaintiff's customers

if plaintiff did not agree to the higher prices; and (4) despite its efforts, plaintiff could not find replacement asphalt below or at the higher price demanded by defendant.

For purposes of this ruling, the court will assume that defendant acted wrongfully.  The parties dispute whether defendant was entitled to reduce deliveries of asphalt.  Assuming defendant committed a wrongful act, there is still one significant problem with plaintiff's claim:  There is insufficient evidence that defendant's act deprived plaintiff of the exercise of free will.

Both parties were sophisticated entities who had contracted with one another for a number of years.  When plaintiff received the letters from defendant, plaintiff looked into its options.  Plaintiff's representatives testified that they considered the offer for several weeks and sought legal counsel. They also testified that because of plaintiff's business necessities, the New Asphalt Contract made more economic sense than buying replacement asphalt at a higher price.  Plaintiff could have chosen to replace the bargained-for asphalt with higher-priced asphalt and sued defendant for the difference, alleging breach of contract.  In fact, plaintiff did buy some of its asphalt elsewhere.  The evidence indicates that plaintiff had sufficient cash stores to purchase the higher-priced asphalt without incurring financial ruin.  But plaintiff elected instead to "trade [its] potential lawsuit for the security of a fixed duration contract."  *Comeau*, 869 F. Supp. at 866; *see also Evans v. Aylward*, 201 P.2d 1044, 1050–51 (Kan. 1949).  This choice was freely made, particularly "'where the party had and took an opportunity for reflection and for making up his mind, and where he consulted with others and had the benefit of their advice, especially where he was advised by his counsel.'"  *White*, 908 F.2d at 673 (quoting *Hastain*, 470 P.2d at 748).

The court does not discredit counsel's statement that defendant was "putting a gun to [plaintiff's] head" and that plaintiff had no choice but to accept defendant's terms.  Indeed, it seems that plaintiff found itself between a rock and a hard place by no fault of its own.  But plaintiff agreed to

the New Asphalt Contract, knowing that it contained a release of claims.  This was an informed and intentional decision.  As a matter of law, the circumstances under which plaintiff entered into the contract did not deprive plaintiff of its free will.

      c.  <u>Lack of Consideration</u>

Plaintiff next claims that the New Asphalt Contract lacked consideration.  Specifically, plaintiff argues that defendant did not make any new, additional promises—defendant only agreed to what it was already obligated to do: deliver asphalt.

Under Kansas law, adequate consideration is "some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other."  *Varney Bus. Serv., Inc. v. Pottroff*, 59 P.3d 1003, 1014 (Kan. 2002) (citation and internal quotation marks omitted).   If one party foregoes its rights under a contract, such concession constitutes sufficient consideration for the other party's agreement to forego its rights.  *Newcastle Homes, LLC v. Thye*, 241 P.3d 988, 997 (Kan. Ct. App. 2010) (citation omitted).   Plaintiff, as the party asserting that the contract lacks consideration, bears the burden of showing a lack of consideration.  Kan. Stat. Ann. § 16-108.  When, as here, a contract is written, consideration is presumed unless the party seeking to invalidate the contract can prove lack of consideration by substantial competent evidence.  *State ex rel. Ludwick v. Bryant*, 697 P.2d 858, 861 (Kan. 1985).

The New Asphalt Contract contains mutual releases of remaining performance requirements and potential claims under the Original Asphalt Contracts.  Mutual releases of claims constitute adequate consideration.  *Thye*, 241 P.3d at 997.  And the New Asphalt Contract also includes mutual promises of performance.  Defendant agreed to provide a set amount of asphalt at a particular price.  Plaintiff agreed to purchase that same amount.  Both of these components are adequate consideration.

      ***2.  Defendant's Counterclaim***

Under the New Asphalt Contract, plaintiff failed to purchase all of the required asphalt. Although the contract required plaintiff to purchase 9,900 tons of asphalt (90% of 11,000), plaintiff purchased only 4,150 tons.  Defendant claims that it is entitled to summary judgment on this breach. Plaintiff responds that (1) defendant waived its counterclaim and (2) defendant's calculation of damages is improper.  Defendant maintains that it attempted to mitigate its damages by selling the asphalt to other customers, but ultimately lost $1,240,037.84 because plaintiff did not buy the asphalt at the agreed price.

The court first considers whether defendant is entitled to summary judgment on the issue of whether it waived its counterclaim.  Plaintiff claims that defendant ignored the mandatory minimum purchase requirements for years before suddenly deciding to enforce the requirement.  Plaintiff offers evidence that defendant has long allowed all of its customers—including plaintiff—to underlift.

Defendant responds that its actual conduct does not matter because the New Asphalt Contract contains the integration clause, as well as a requirement that all waivers be in writing.

Despite the integration clause and the waiver-in-writing provision, the court determines that defendant may be estopped from seeking underlifting damages from plaintiff.  The court cannot make this determination on the record before it, however, and will hear this issue at trial.

Because the court does not issue a definitive ruling on defendant's counterclaim, the court also will deny summary judgment on defendant's claim for damages.  The parties shall present evidence on the proper calculation of damages (if damages are warranted) at trial.  Defendant's motion for summary judgment is denied on this issue.

### B.  Plaintiff's Motion for Partial Summary Judgment

Because the court has determined that plaintiff does not have a valid claim for breach of contract, the only issue left for consideration in plaintiff's motion for partial summary judgment is

whether defendant waived its right to bring its counterclaim.  Just as defendant is not entitled to summary judgment on this issue, neither is plaintiff.  The court will conduct trial on defendant's counterclaim and any damages to which defendant may be entitled based on the counterclaim.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 69) is granted in part and denied in part.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 65) is denied.

Dated this <u>13th</u> day of February, 2012, at Kansas City, Kansas.

<u>s/ Carlos Murguia</u>
**CARLOS MURGUIA**
**United States District Judge**